[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 19-11258

————————————————

D.C. Docket No. 1:14-cv-02288-TWT

SAVANNAH COLLEGE OF ART AND DESIGN, INC.,

Plaintiff - Appellee,

versus

SPORTSWEAR, INC.,
d.b.a. PrepSportswear,

Defendant - Appellant.

————————————————

Appeal from the United States District Court
for the Northern District of Georgia

————————————————

(December 22, 2020)

Before WILLIAM PRYOR, Chief Judge, ROSENBAUM, Circuit Judge, and
MOORE[*], District Judge.

——————————————

[*] Honorable K. Michael Moore, Chief United States District Judge for the Southern District
of Florida, sitting by designation.

ROSENBAUM, Circuit Judge:

As a student struggling in 1971 to afford art classes at Portland State University, Carolyn Davidson did not say "no" when a businessman offered to pay her to come up with a logo design for his company. She drew a few different designs on tissue paper, and the businessman selected one. From these humble origins, Davidson's design became the globally recognized Nike Swoosh.[1]

Successful logos and design marks are lucrative—their recognition can instantly ignite an emotional connection with the associated brand.[2] And this is especially true for colleges, where sentimentality and pride create great demand for products emblazoned with schools' word and design marks—so much so that an entire industry has grown up around producing logo products for schools, colleges, and universities.

Plaintiff-Appellee Savannah College of Art and Design, Inc. ("SCAD"), and Defendant-Appellant Sportswear, Inc. ("Sportswear"), are now before us a second

---

[1] Carolyn Davidson, *How a College Student Created One of Sport's Most Iconic Images*, ABC News, (June 17, 2016, 4:57 PM), https://abcnews.go.com/Sports/college-student-created-sports-iconic-images/story?id=39945185 (last visited Dec. 21, 2020). Davidson charged only $35 for her first deal with the shoe company now valued in the billions. Twelve years later, in 1983, Nike also gave her a gold ring in the shape of the Swoosh with a diamond in it and shares of Nike stock (not to mention chocolate dessert Swooshes). *Id.*

[2] When Tropicana briefly dropped its iconic green-and-gold-lettering and orange-with-a-protruding-straw design marks for plain font appearing next to a glass of orange juice, the Tropicana Pure Premium line experienced a 20% drop in sales in less than two months. Sarah Shearman, *Five Brand Logo Redesigns that Misfired and How to Deal with the Backlash*, The Guardian, (Aug. 1, 2014), https://www.theguardian.com/media-network/media-network-blog/2014/aug/01/brand-logo-redesign-airbnb-foursquare. That was apparently enough to convince Tropicana to return to its former design marks. *See id.*

time on the merits in a dispute over Sportswear's use of the college's word marks "SCAD" and "SAVANNAH COLLEGE OF ART AND DESIGN" and the college's design mark that includes its mascot, Art the Bee.

SCAD did not authorize Sportswear to use its marks to sell products inscribed with SCAD's name and mascot. Upon discovery of Sportswear's offerings, SCAD sued Sportswear for trademark infringement, unfair competition, false designation of origin, and counterfeiting under the Lanham Act, and for unfair competition and trademark infringement under Georgia common law.

On the first trip to this Court, SCAD appealed, and we considered the district court's grant of summary judgment to Sportswear on all counts. We reversed, holding that our precedent required us to conclude that SCAD enjoyed enforceable trademark rights in the marks Sportswear used.[3] We remanded to the district court to determine, in the first instance, whether Sportswear's uses of the marks were likely to cause consumer confusion. *Savannah College of Art & Design, Inc. v. Sportswear, Inc.*, 872 F.3d 1256, 1264, 1265 (11th Cir. 2017) ("*SCAD I*").

On remand, the district court concluded they were. Having previously dismissed SCAD's counterfeit claim, the district court granted summary judgment

---

[3] An infringement claim requires demonstration "(1) that the plaintiff had enforceable trademark rights in the mark or name, and (2) that the defendant made unauthorized use of the mark or name such that consumers were likely to confuse the two." *See Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007) (citation and internal quotation marks omitted).

to SCAD on its remaining three counts—two claims under the Lanham Act and one claim under Georgia law—and permanently enjoined Sportswear from selling products bearing the SCAD marks at issue.  Now, on this case's second merits trip to this Court, Sportswear appeals the district court's decision.  After careful consideration, we affirm.

## I.    <u>Factual Background</u>

We begin with a summary of the underlying facts of this case.[4]  SCAD, based in Georgia, is a private, non-profit college founded in 1978.  It provides educational services to more than 11,000 students from more than 100 countries, including the United States.  SCAD is principally known for specialized art programs in areas like painting, sculpture, architecture, fashion, photography, film, and design.  Beyond SCAD's educational programs, SCAD's athletic teams compete in a variety of intercollegiate sports.

This case concerns two word marks and one design mark that SCAD has used to market and promote its educational programs and services, as well as its athletic teams:

---

[4] The facts are outlined in more detail in *SCAD I*, 872 F.3d at 1259–60, including specific circumstances surrounding the marks' registrations and incontestable status.  For reasons we discuss below in Section IV, we do not reach the legal arguments regarding the significance of the marks' incontestable status, so we need not recount those details here.

SCAD    **SAVANNAH COLLEGE OF ART AND DESIGN**    

SCAD has used the two word marks—"SCAD" and "SAVANNAH COLLEGE OF ART AND DESIGN"—since 1979. As for the design mark containing SCAD's mascot, "Art the Bee," SCAD began using that in 2001, after having used variations of the bee portion since 1996.[5]

Sportswear operates an online business that markets and sells "fan" apparel and other items, such as t-shirts, sweatshirts, baseball caps, and duffel bags. Although Sportswear began selling apparel for kindergartens, grade schools, and high schools in 2003, it currently offers made-to-order apparel and related goods for other entities, including colleges, Greek and military organizations, golf courses, professional sports teams, and even fantasy sports teams. Sportswear sells some of its goods with licensing agreements and others—such as the goods bearing SCAD's marks—without.

In August 2009, Sportswear sold its first merchandise bearing SCAD's marks. But SCAD remained unaware of Sportswear's unauthorized use of its marks on products until February 2014, when a parent of a student-athlete

---

[5] The design mark, as shown above, consists of an image of SCAD's mascot, "Art the Bee," in the middle of a circle containing the words "SAVANNAH COLLEGE OF ART AND DESIGN" and "BEES." In this opinion, we refer to this design mark as the "Bee Design Mark."

forwarded Sportswear's website to one of SCAD's coaches. SCAD filed this case in July 2014, and Sportswear then stopped selling the unlicensed merchandise with SCAD's marks in its online "Savannah College of Art and Design Bees" store.

Before then, though, Sportswear undeniably marketed and sold products with both of SCAD's word marks, "SCAD" and "Savannah College of Art and Design." And while it did not use the Bee Design Mark in its full depiction, Sportswear's online store did offer apparel imprinted with SCAD's "Art the Bee" mascot, a prominent feature in the Bee Design Mark.

Sportswear's website contained several disclaimers that the clothing was not sponsored, endorsed by, or affiliated with SCAD and that all products were exclusively produced and fulfilled by Sportswear. Similarly, Sportswear's website, advertising material, and packaging material did not indicate that any of the merchandise constituted official SCAD products or were endorsed by SCAD. Finally, we note that several other third-party online retailers besides Sportswear printed SCAD's word marks on apparel.

## II.    **Procedural Background**

Based on these facts, SCAD sued Sportswear under the Lanham Act for claims of trademark infringement, unfair competition and false designation of origin, and counterfeiting, and under Georgia common law for unfair competition and

trademark infringement.  Sportswear moved for summary judgment, and the district court granted its motion.  SCAD appealed.

That brings us to *SCAD I*, *Savannah College of Art & Design, Inc. v. Sportswear, Inc.*, 872 F.3d 1256 (11th Cir. 2017).  In *SCAD I*, we reversed the district court's grant of summary judgment in favor of Sportswear.  We explained that SCAD's claims for trademark infringement under § 32(a) of the Act, codified at 15 U.S.C. § 1114(1)(a), and for unfair competition and false designation of origin under § 43(a), codified at 15 U.S.C. §1125(a), required SCAD to establish two things.  First, SCAD needed to show enforceable trademark rights in its marks used by Sportswear.  *Id.* at 1261.  And second, it had to prove that Sportswear's unauthorized use of its marks was likely to confuse consumers.  *Id.*

With respect to the first requirement, we concluded that the district court had applied an erroneous standard in limiting the reach of SCAD's service-mark rights from extending to goods.  *Id.* at 1260, 1262.  Under our binding precedent, we said, SCAD's enforceable service-mark rights for educational "services" could also cover "goods" in the form of the apparel Sportswear sold.  *Id.* at 1262–64 (relying on *Boston Prof'l Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004 (5th Cir. 1975)).[6]

---

[6] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (holding that all decisions of the "old Fifth" Circuit handed down prior to the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit).

Then we turned to the second inquiry: likelihood of confusion. Because the district court had not previously had the opportunity to assess the likelihood of confusion, we remanded the matter and directed the district court to assess in the first instance whether Sportswear's use of SCAD's service marks in Sportswear's apparel was likely to cause confusion. *Id.* at 1264. To evaluate this, we instructed the district court to consider the following seven factors: the strength of SCAD's marks; the similarity between SCAD's and Sportswear's marks, between Sportswear's goods and SCAD's services represented by the marks, between the parties' trade channels and customers, and between the advertising media used by the parties; Sportswear's intent; and the existence of any actual consumer confusion. *Id.* (citing *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1255 (11th Cir. 2016)).[7]

Following remand, the parties filed letter briefs with the district court and responses thereto, addressing the likelihood-of-confusion issue and asserting that the record was complete and that no disputes of fact remained for trial. The court then once again took under advisement the parties' previously filed cross-motions for summary judgment, this time applying our guidance in *SCAD I*.

After consideration, the district court entered an order granting in part

---

[7] Before the case returned to the district court, Sportswear unsuccessfully sought a writ of certiorari to the United States Supreme Court. *Sportswear, Inc. v. Savannah Coll. of Art & Design, Inc.*, 139 S. Ct. 57 (2018).

Sportswear's motion for summary judgment[8] and granting SCAD's motion for summary judgment on the trademark-infringement, unfair-competition, and false-designation-of-origin claims. Based on this ruling, the district court ultimately entered permanent injunctive relief for SCAD against Sportswear. In particular, the court enjoined Sportswear from using in any way the three SCAD marks at issue in this case. It further ordered Sportswear to delete all references to the three SCAD marks from its websites and databases. Finally, the court directed that any sales or shipments in the continental United States by Sportswear of products bearing the SCAD marks, without SCAD's prior written consent "shall be deemed a presumptive violation" of the injunction.

Sportswear appeals.

## III. <u>Standard of Review</u>

We review de novo the district court's grant of summary judgment. *Code Revision Comm'n for Gen. Assembly of Ga. v. Public.Resource.Org, Inc.*, 906 F.3d 1229, 1235 (11th Cir. 2018). In so doing, we apply the same standards that bound the district court. *Id.* We view the record and draw all factual inferences in the light most favorable to the non-movant—here, Sportswear. *SCAD I*, 872 F.3d at 1260.

---

[8] The district court ruled on two issues that are not subject to this appeal. It granted Sportswear's motion for summary judgment on SCAD's claims for infringement of the "shield design mark" because SCAD offered no proof that Sportswear has ever used the image. And to the extent that SCAD sought to hold Sportswear liable for its use of the words in the shield design, the district court noted that SCAD's other counts already covered that. The district court also denied Sportswear's motion for summary judgment on the defense of functionality.

Summary judgment is proper if the movant demonstrates that no genuine dispute of any material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

We may affirm a district-court judgment on any ground supported in the record, even if the district court did not specifically address it. *Wetherbee v. S. Co.*, 754 F.3d 901, 905 (11th Cir. 2014).

## IV.  <u>Discussion</u>

We conclude that our trademark precedents of *Boston Hockey*, *Laite*,[9] and *SCAD I* require affirmance of the district court's judgment.[10] Our mandate in *SCAD I* directed the district court to "assess the strength of SCAD's word marks" and to "consider whether SCAD has demonstrated that Sportswear's use of its word marks is likely to create consumer confusion as to origin, source, approval, affiliation, association, or sponsorship." 872 F.3d at 1264. The district court complied, and we see no error in its determination.

---

[9] *Univ. of Ga. Ath. Ass'n v. Laite*, 756 F.2d 1535 (11th Cir. 1985).

[10] We do not consider the so-called *Dieter* presumption in our analysis. In *Dieter v. B & H Industries of Southwest Florida, Inc.*, we held that a mark's incontestable status is a factor to be taken into consideration in the likelihood-of-confusion analysis, concluding that the incontestable status required a presumption that the mark was "at least descriptive with secondary meaning, and therefore a relatively strong mark." 880 F.2d 322, 329 (11th Cir. 1989). We have recognized that *Dieter* is an outlier and opined that it is "almost certainly incorrect." *Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Florida Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, The Ecumenical Order*, 809 F.3d 1171, 1183 (11th Cir. 2015). Nevertheless, until *Dieter* has been overturned by this Court *en banc*, it remains the law of this Circuit. *Id.* at 1184. But here, the record supports the entry of summary judgment in favor of SCAD even without the *Dieter* presumption, so we do not address Sportswear's arguments concerning the district court's application of *Dieter*.

1.    <u>Likelihood-of-Confusion Framework</u>

In this Circuit, we consider seven factors when we analyze whether a likelihood of confusion exists between two marks:

> (1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

*Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Florida Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, The Ecumenical Order*, 809 F.3d 1171, 1181 (11th Cir. 2015) (quoting *Tana v. Dantanna's*, 611 F.3d 767, 774–75 (11th Cir. 2010)).  The district court need not consider all factors in every case.  *Id.*  But we have said that "the type of mark and the evidence of actual confusion are the most important" of all the factors.  *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1255 (11th Cir. 2016).

On the other hand, in cases where the concern for confusion does not arise from the defendant's unfair competition with the plaintiff's products, but rather from "the defendant's misuse of the plaintiff's reputation and good will as embodied in the plaintiff's mark," we discount certain likelihood-of-confusion factors.  *Laite*, 756 F.2d at 1547.  In particular, we have held that the three factors of similarity of

product, identity of retail outlets and purchasers, and identity of advertising media utilized are less relevant in these types of cases. *Id.* So their absence "does not undermine the district court's finding of a 'likelihood of confusion.'" *Id.*

In line with the reasoning we expressed in *Laite*, our instructions in *SCAD I* to address the likelihood-of-confusion analysis focused on confusion over "origin, source, approval, affiliation, association, or sponsorship." 872 F.3d at 1264. These considerations directly relate to the misuse of SCAD's "reputation and good will as embodied in [its] mark[s]." *Laite*, 756 F.2d at 1547.

On review of a district court's grant of summary judgment on a likelihood-of-confusion analysis, "[t]he real question is whether the court's ultimate determination about the 'likelihood of confusion' was correct." *Sovereign Military*, 809 F.3d at 1181 (11th Cir. 2015) (citation and internal quotation marks omitted). And while generally likelihood of confusion raises a question of fact, when appropriate, it may be determined as a matter of law. *Alliance Metals, Inc., of Atlanta v. Hinely Indus., Inc.*, 222 F.3d 895, 907 (11th Cir. 2000).

We decide each case on its own merits, determining whether the plaintiff has satisfied the threshold for evidence of confusion based on the circumstances of the particular case. *See Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 122 F.3d 1379, 1382 (11th Cir. 1997). When we analyze the likelihood of confusion, we are mindful that "sophisticated consumers" of complex goods or services "are

less likely to be confused than casual purchasers of small items." *Fla. Int'l Univ.*, 830 F.3d at 1256 (citation and internal quotation marks omitted). We accord weight to the individual likelihood-of-confusion factors based on what the situation calls for and do not simply calculate the number of factors favoring such a conclusion and the number of factors militating against it. *See Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 840 n.17 (11th Cir. 1983).

In reviewing the likelihood-of-confusion factors here, we begin with SCAD's word marks and then move on to its Bee Design Mark.

2.    SCAD's Word Marks

a.    *Strength of the Marks*

On the issue of the strength of SCAD's word marks ("SCAD" and "Savannah College of Art and Design"), it is undisputed that both service marks hold incontestable status. But as we have noted above, *see supra* at n.10, on this record we do not rely on the *Dieter* presumption to conclude that SCAD's word marks are strong under these facts.

Instead, we consider the strength of the mark under our traditional analysis. Our Circuit recognizes four categories of a mark's distinctiveness, listed in ascending order of strength:

> (1) generic—marks that suggest the basic nature of the product or service; (2) descriptive—marks that identify the characteristic or quality of a product or service; (3) suggestive—marks that suggest characteristics of the product or service and require an effort of the

13

imagination by the consumer in order to be understood as descriptive; and (4) arbitrary or fanciful—marks that bear no relationship to the product or service, and the strongest category of trademarks.

*Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 797–98 (11th Cir. 2003). We have explained that we view the last two categories of marks—suggestive and arbitrary or fanciful—as "inherently distinctive." *Tana*, 611 F.3d at 774 (citation and internal quotation marks omitted). These are marks whose "intrinsic nature serves to identify a particular source of a product." *Id.* (citation and internal quotation marks omitted). At the other end of the spectrum, generic marks, which cannot be registered as trademarks under the Lanham Act, generally cannot receive trademark protection. *Id.*

Descriptive marks fall between these two extremes. Although they are not inherently distinctive like suggestive and arbitrary or fanciful marks, descriptive marks nonetheless may become distinctive enough to enjoy trademark protection if they acquire "secondary meaning." *Id.*; 15 U.S.C. § 1052(f). Secondary meaning develops when the consuming public primarily associates a name with the producer, as opposed to the product. *Tana*, 611 F.3d at 774. Ultimately, the strength or distinctiveness of the trademark or service mark corresponds directly with the scope of protection it receives. *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1361 (11th Cir. 2007).

SCAD's word marks have acquired significant strength through the more than

four decades of their use and through SCAD's investment in goodwill. At the time the parties filed their cross-motions for summary judgment, SCAD enrolled over 11,000 students, and now its enrollment numbers thousands more than that. It is among the leading institutions for creative professionals, with several programs honored as the best in the nation. Not only that, but SCAD also has nationally ranked athletic teams. As a consequence of that growth in goodwill and reputation since 1978, SCAD enjoys a worldwide reach of students and alumni, as well as other supporters, who recognize its marks. And beyond academics and athletics, SCAD coordinates other events throughout the year that draw tens of thousands of attendees.

These unrebutted facts support the conclusion that SCAD's word marks have acquired strength through the promotional efforts of SCAD and its network of connections. *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 974 n.13 (11th Cir. 1983). Even words that could be considered weak, such as geographical terms, can acquire secondary meaning and be afforded protection for that secondary meaning. *See also Cont'l Motors Corp. v. Cont'l Aviation Corp.*, 375 F.2d 857, 861 (5th Cir. 1967) ("Protection is warranted on what it has come to signify regardless of any original weakness, actual or supposed.").

Sportswear attempts to rebut any strength of SCAD's word marks by pointing to three other third-party apparel manufacturers who have used the marks.

Sportswear is correct that, as a general matter, third-party use has the potential to weaken a finding of a mark's strength.  *See Fla. Int'l Univ.*, 830 F.3d at 1257 ("Thus, the number of third-party users is important, but there is no hard-and-fast rule establishing a single number that suffices to weaken a mark." (citation and internal quotation marks omitted)).  Indeed, when extensive third-party use has occurred, that diminishes a mark's strength.  *Id.* at 1257–58 (finding twelve third-party uses sufficient to diminish); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1539 (11th Cir. 1986) (affording lesser protection where eight third-party users employed similar trade dress); *El Chico, Inc. v. El Chico Cafe*, 214 F.2d 721, 725 (5th Cir. 1954) (concluding "El Chico" trademark was "weak" in light of registrations of the name and similar names by twenty-seven third parties).

But here, Sportswear has identified only three third-party usages of SCAD's marks—significantly fewer than we have previously relied on in finding a mark's strength to be materially diluted.   "[C]ommercial strength measures the marketplace's recognition value of the mark."  *Fla. Int'l Univ.*, 830 F.3d at 1258. And as we have explained, SCAD's word marks here developed substantial strength over SCAD's forty years of existence, because of the size and reach of its student body, its alumni network, and its programs.  Under these circumstances, even viewing the facts in the light most favorable to Sportswear, we cannot conclude that Sportswear has shown that the three third-party uses diminished the strength of

16

SCAD's word marks by more than any negligible amount.

Nor can Sportswear contend persuasively that the SCAD marks are weak. On the contrary, it strains credulity for Sportswear to argue against the strength of SCAD's marks when Sportswear offered and sold merchandise with those identical word marks to obtain a profit from its consumers. If the marks had no strength, consumers would not purchase attire imprinted with them in the first place, and Sportswear would have no reason to offer for sale products bearing the marks. We have recognized this concept in our precedent that proof of intentional copying is probative on the secondary-meaning analysis. *See Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 860 (11th Cir. 1983).

In sum, the strength factor favors SCAD, as the district court correctly concluded, even without reliance on the *Dieter* presumption.

b.      *Similarity Between the Infringed and Infringing Marks*

We evaluate similarity by accounting for "the overall impression created by the marks." *Jellibeans*, 716 F.2d at 842. Here, Sportswear undoubtedly used similar marks to SCAD's word marks. In fact, they were not just similar, but identical, as the record shows that Sportswear used SCAD's two word marks on its apparel, as well as the Art the Bee design with other SCAD marks. So this factor weighs in SCAD's favor as well, as the district court correctly concluded.

17

### c.    *Similarity of Goods or Services*

The similarity-of-goods factor assesses "whether the goods are so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods." *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1338 (11th Cir. 1999); *see also PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1168 (11th Cir. 2019).

In *Laite*, as we have highlighted, we noted that this factor is less important in cases—like this one—that concern the use of the plaintiff's service marks on the defendant's goods for the very reason that the plaintiff's marks embody the plaintiff's goodwill and reputation. *See Laite*, 756 F.2d at 1547. So the district court did not err in giving the factor little significance.

### d.    *Similarity of Actual Sales Methods*

The similarity-of-actual-sales-methods factor contemplates the similarity of the parties' customer bases. *See Sovereign Military*, 809 F.3d at 1181. Here, the parties' customer bases overlap, as the target customers for Sportswear's apparel goods bearing SCAD's word marks are the same as those of SCAD's educational services—namely, its current students and their parents, its alumni and faculty, and fans of its athletic teams. This factor therefore weighs in favor of SCAD. Nevertheless, since *Laite* instructs that this factor bears less (if any) weight in cases like this one (where the defendant seeks to trade off the plaintiff's goodwill and

reputation, as opposed to its products), its weight is not much.  *See Laite*, 756 F.2d at 1547.

   e. *Similarity of Advertising Methods*

   The similarity of advertising methods is the third factor that *Laite* holds is less important to the likelihood-of-confusion analysis in a case like this one.  *See Laite*, 756 F.2d at 1547.  We conclude that the district court did not err in finding this factor neutral.  As the district court noted, although both parties advertise over the internet, "[t]hat the goods or services of the parties are both found on the Internet proves little, if anything, about the likelihood that consumers will confuse similar marks used on such goods or services."  4 McCarthy on Trademarks and Unfair Competition § 24:53.50 (5th ed.).

   f. *Sportswear's Intent to Misappropriate SCAD's Goodwill*

   Next up, we consider Sportswear's intent to misappropriate SCAD's goodwill.  Sportswear relies on its use of website disclaimers to negate any finding of intent to confuse consumers.  Intent may be proven by circumstantial evidence.  *Jellibeans*, 716 F.2d at 843.  The district court, relying on *Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1179 (11th Cir. 1994), reasoned that intent to copy in itself can create a rebuttable presumption of the likelihood of confusion.  But the district court ended its analysis there, noting that SCAD had not argued for such a presumption, yet concluding that the factor favored SCAD.

*Babbit* certainly supports the notion that, as a matter of law, courts may find a likelihood of confusion "if the defendant intended to derive benefit from the plaintiff's trademark." 38 F.3d at 1179. And where a party copies a mark "with the intent that the public recognize and purchase the emblems as the symbol of the" mark holder, intent likewise can be found. *Boston Hockey*, 510 F.2d at 1012.

This is equally true when the defendant intends to derive a benefit from the good will of the mark holder. *See John H. Harland Co.*, 711 F.2d at 977 ("In this case, there is some evidence from which the jury might have inferred that Clarke adopted the Entry Stub mark in order to appropriate some of the good will associated with Harland's Memory Stub mark. Clarke was well aware of the success of Harland's Memory Stub product."); *AmBrit*, 812 F.2d at 1542 ("[A] finding that Kraft adopted the trade dress with the intent of deriving benefit from the reputation of Isaly's Klondike may alone be enough to justify the inference that there is confusing similarity."); *see also AmBrit*, 812 F.2d at 1543 ("Although Kraft was free to copy the Klondike product and the functional packaging features of that product, the finder of fact may infer from evidence of such actions an intent to derive benefit from Isaly's goodwill.").

Nevertheless, we have observed that mere evidence of intentional copying— in the absence of any other evidence—does not conclusively establish a likelihood of confusion. *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1293

(11th Cir. 2018).  Rather, the plaintiff must also present some evidence indicating that the defendant copied the marks with the intent to confuse customers.  *Id.* at 1294 (finding the district court properly concluded plaintiff put forth no evidence showing intent to copy "in order to deceive consumers as to the source of [the] boats" and "cause consumer confusion"); *see id.* at 1293 ("There is a difference between intentional copying and intentional copying *with the intent to cause confusion*." (emphasis in original)); *see also Jellibeans*, 716 F.2d at 843 (circumstantial evidence, including testimony, supported finding of intent to confuse roller-skaters).

The very nature of school memorabilia relies upon the goodwill, reputation, and affiliation people associate with that school.  So it is not surprising that Sportswear even admits on appeal that customers visit its website to "create apparel bearing the name of the school, team, or organization with which they desire to express affiliation."  Cognizant of the intuitive link between school merchandise and sponsorship, Sportswear cannot reasonably argue against a finding of intent here.

Nor can Sportswear rely on its website disclaimers to completely negate any finding of intent.  To be sure, Sportswear's website bears these prominent disclaimers:  "This store is not sponsored or endorsed by Savannah College of Art and Design" and "This store is not affiliated with, sponsored or endorsed by Savannah College of Art and Design.  All products in this store are produced and fulfilled by Prep Sportswear."  And Sportswear urges the Court to distinguish our

holdings on the insufficiency of product disclaimers in *Boston Hockey* and *Laite* and instead rely on the finding of successful website disclaimers in the District of Maryland and the Northern District of Georgia.  But while Sportswear correctly notes that the disclaimers in *Boston Hockey* and *Laite* did not involve websites, but rather disclaimers on physical products, we are nonetheless guided by those holdings here.

In *Boston Hockey*, we considered the unauthorized manufacturing and sale of National Hockey League embroidered cloth emblems, which "were substantial duplications of the marks," and which the defendant reproduced with the intention that consumers recognize the hockey-team symbols and purchase them for that reason.  510 F.2d at 1009.  After we addressed the Lanham Act claims, we considered and rejected the idea that the common-law unfair competition claim could be rendered fair with a disclaimer.  We said, "The exact duplication of the symbol and the sale as the team's emblem satisfying the confusion requirement of the law, words which indicate it was not authorized by the trademark owner are insufficient to remedy the illegal confusion.  Only a prohibition of the unauthorized use will sufficiently remedy the wrong."  *Id.* at 1013.

Similarly, in *Laite*, the defendant, a wholesaler of novelty beers, began marketing "Battlin' Bulldog Beer," which the district court found caused a likelihood of confusion with the University of Georgia Bulldog. 756 F.2d at 1537.

The beer wholesaler argued, among other things, on appeal that no confusion from the sale of "Battlin' Bulldog Beer" could occur because each can contained a disclaimer that the beer was "[n]ot associated with the University of Georgia." *Id.* at 1547. We soundly rejected that argument and held that the disclaimer was insufficient to negate confusion—both because the disclaimer was inconspicuous on the individual cans and because *Boston Hockey* required us to conclude that disclaimers noting that a product is not authorized by a trademark owner are insufficient to remedy the consumer's confusion. *Id.* (citing *Boston Hockey*, 510 F.2d at 1013).

So as in *SCAD I*, *Boston Hockey* and its progeny control our analysis here—this time on the disclaimer issue—and they require us to find that the intent factor does not favor Sportswear. Perhaps the website disclaimers here may be viewed as negating some of Sportswear's intent. But even if they are, like the disclaimers in *Boston Hockey* and *Laite*, they are insufficient under our binding precedent to totally negate the confusion. *See Boston Hockey*, 510 F.2d at 1013.

The record and the nature of this case demonstrate that companies like Sportswear copy the word marks of schools like SCAD for application on apparel for the very reason that SCAD's goodwill and educational reputation fundamentally drive the sales. Like the intended customers in *Boston Hockey* and *Laite*, the customers who purchased Sportswear's SCAD-branded merchandise, whether

current students and faculty, alumni, or sports fans, did so because of the merchandise's affiliation with the marks and because what the marks represent are meaningful to buyers. Indeed, that's the same reason the *Boston Hockey* defendant sold patches bearing the teams' trademarks: it hoped to benefit from the patches' association with what they represented. *See Boston Hockey*, 510 F.2d at 1012. Thus, we conclude that the district court did not err in finding that this factor favors SCAD.

g.    *Actual Confusion in the Consuming Public*

While this final actual-confusion factor weighs heavily in the balance, we have noted that its absence does not necessarily spell doom for a final finding of a "likelihood" of confusion under the seven-factor analysis. *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1529 (11th Cir. 1985). "Actual confusion" and "likelihood of confusion" are demonstrably different concepts. That is especially the case in smaller markets with cheaper items and minimal sales. *AmBrit*, 812 F.2d at 1544. Survey evidence is similarly unnecessary for a likelihood-of-confusion finding. *See PlayNation*, 924 F.3d at 1169 ("Lack of survey evidence does not weigh against the plaintiff when determining likelihood of confusion.").

Here, SCAD offers only one piece of evidence to show actual confusion: a parent of a student sent a link to Sportswear's website to one of SCAD's employees, and the employees were unsure whether Sportswear's use was authorized. This is hardly strong evidence of actual confusion. As the district court correctly concluded,

this factor weighs in favor of Sportswear, but it is not determinative of the issue of likelihood of confusion under the multifactor analysis. In fact, for the entirety of the nearly five-year period from August 31, 2009, to July 27, 2014, when Sportswear sold products bearing SCAD's marks, the record of total sales for those products was $23,703.14, with net profits of $1,896.25. The vast majority of individual sales were under $100, with a small number reaching into the $200–$300 range. In other words, this is precisely the type of case, with a smaller market and inexpensive goods, in which we have cautioned that weak evidence of actual consumer confusion is not dispositive. *See AmBrit*, 812 F.2d at 1544.

h. *Balancing the Seven Factors*

Now that we have individually reviewed each of the seven likelihood-of-confusion factors, we evaluate the weight of the facts, considering the unique circumstances of the case. *See Lone Star Steakhouse*, 122 F.3d at 1382; *Jellibeans*, 716 F.2d at 840 n.17. In doing so, we must keep in mind that the strength and type of the mark and the evidence of actual confusion are the most important factors. *Fla. Int'l Univ.*, 830 F.3d at 1255.

Of the seven factors, four favor SCAD: the strength of the mark, the similarity of the infringed and infringing marks, the similarity of Sportswear's and SCAD's customer base, and the intent of Sportswear to misappropriate SCAD's goodwill.

One factor—undoubtedly one of the two most important ones—favors

Sportswear, since the record contains little evidence of any actual consumer confusion.  But as we just discussed, the relatively low sales volume, over the five-year period, of items bearing SCAD's marks and the relatively inexpensive nature of the goods further lessen the import of the actual-confusion factor.  *See AmBrit*, 812 F.2d at 1544.  As we have explained, the likelihood-of-confusion analysis must be mindful that "casual purchasers of small items" are more likely to be confused than more sophisticated consumers of complex goods.  *See Fla. Int'l Univ.*, 830 F.3d at 1256 (citation and internal quotation marks omitted).

Finally, as we have also described, the remaining factors are of little relevance here because the concern for confusion does not arise from Sportswear's unfair competition with SCAD's products, but rather from Sportswear's "misuse of the plaintiff's reputation and good will as embodied in the plaintiff's mark."  *See Laite*, 756 F.2d at 1547.  Given the balance of facts in this matter, we conclude that the district court correctly found a likelihood of confusion as to Sportswear's use of SCAD's word marks.

3.    <u>The Bee Design Mark</u>

Now we briefly address the parties' arguments concerning Art the Bee.  First, Sportswear argues that it cannot be held liable for use of Art the Bee because SCAD ostensibly abandoned the design mark in 2011.  But since we are reviewing the denial of Sportswear's motion for summary judgment on that issue, we must take

the facts in the light most favorable to SCAD.  While Sportswear points to the 2011 memo regarding non-use of the Art the Bee mark in future athletic merchandise, SCAD responds with evidence of Art the Bee's continued use on athletic apparel.  So we cannot say that Sportswear has shown entitlement as a matter of law under the stringent, heavy burden for demonstrating abandonment.  *See Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1175 (11th Cir. 2002).

Next, Sportswear argues that any claims regarding its use of Art the Bee are moot, relying on the cancellation of the design mark in September 2016.  A case becomes moot if "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *De La Teja v. United States*, 321 F.3d 1357, 1362 (11th Cir. 2003) (citation and internal quotation marks omitted).  A court may not decide a case that has become moot because it no longer constitutes a "Case" or "Controversy" as Article III of the Constitution requires, so the court lacks jurisdiction.  *BankWest, Inc. v. Baker*, 446 F.3d 1358, 1363 (11th Cir. 2006).  Rather, Article III's case-or-controversy requirement demands a live controversy throughout all stages of the litigation.  *Id.*

Here, the case is not moot.  Though Sportswear points to SCAD's cancellation of the Art the Bee design mark in 2016, all Sportswear's uses occurred before that happened—between 2009 and 2014.  So to the extent that Sportswear violated the

Bee Design Mark during that period, SCAD may be entitled to damages, regardless of its later cancellation of the mark. As a result, the design-mark claim is not moot.

Sportswear next asserts that it should prevail on the design-mark issue because the record is devoid of any evidence that it ever printed products with the Bee Design Mark. But violating the Bee Design Mark does not require a verbatim copying of the Bee Design Mark. *Jellibeans*, 716 F.2d at 842. Rather, a violation can occur based on the overall impression of the copy. *Id.*

Likewise, any argument by Sportswear that it cannot infringe SCAD's Bee Design Mark because it did not use the *identical* version of the design misunderstands the likelihood-of-confusion test, which does not require the marks to be identical. Rather, the question is *similarity* of the marks. And the graphic Sportswear used for apparel on its website is materially indistinguishable from the "angry bee" SCAD used as Art the Bee:





SCAD                                Sportswear

For these reasons, the district court correctly determined that "uncontroverted evidence" established that Sportswear had used "the bee portion of the logo in

28

conjunction with [SCAD's] text marks." And the same analysis we conducted with respect to SCAD's word marks applies equally to the Bee Design Mark here. As a result, the likelihood-of-confusion factors support the district court's finding that Sportswear's uses of the Bee Design Mark were an infringement.

## V.    <u>Conclusion</u>

For the reasons we have explained, the district court properly entered summary judgment and the corresponding permanent injunction in favor of SCAD. We therefore affirm the judgment of the district court.

**AFFIRMED.**